MICHAEL J. HADDAD (SBN 189114)
JULIA SHERWIN (SBN 189268)
TERESA ALLEN (SBN 264865)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, CA 94612
Telephone:    (510) 452-5500
Facsimile:    (510) 452-5510

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

MARKWHAN KITCHER-TUCKER, DECEASED, by and through his Co-Successors in Interest, LATOYA STARKS and SANVADA KITCHER, LATOYA STARKS, Individually; SANVADA KITCHER, Individually,

                    Plaintiffs,

    vs.

CITY AND COUNTY OF SAN FRANCISCO, a public entity; SAN FRANCISCO SHERIFF PAUL MIYAMOTO, in his individual and official capacities; Jail Captain STEPHEN TILTON, LOREN ROTH, M.D., TIANYI ZHANG, M.D., and DOES 1–20; individually, jointly, and severally,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

**COMPLAINT FOR DAMAGES, DECLARATORY & INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL**

Plaintiffs, by and through their attorneys, HADDAD & SHERWIN LLP, for their Complaint against Defendants, state as follows:

## JURISDICTION

1.      This is a civil rights wrongful death/survival action arising from Defendants' deliberate indifference to the serious medical and mental health needs of pretrial detainee, MARKWHAN KITCHER-TUCKER, resulting in his suicide on January 10, 2021, at San Francisco County jail.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act ("ADA") – 42 U.S.C. § 12132 and 28 C.F.R. §35, et seq., the Rehabilitation Act ("RA") – 29 U.S.C. § 794, et seq., and the laws and Constitution of the State of California.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.  Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law.

## INTRADISTRICT ASSIGNMENT

2.      A substantial part of the events and/or omissions complained of herein occurred in the City of San Bruno, San Mateo County, California, and, pursuant to Northern District of California Civil Local Rule 3-2(d), this action is properly assigned to the San Francisco or Oakland Division of the United States District Court for the Northern District of California.

## PARTIES AND PROCEDURE

3.      Plaintiff LATOYA STARKS is the mother of Decedent MARKWHAN KITCHER-TUCKER and a resident of the State of California.  Plaintiff LATOYA STARKS brings these claims individually and as Co-Successor in Interest for her son, Decedent MARKWHAN KITCHER-TUCKER, pursuant to California Code of Civil Procedure §§ 377.10 *et seq*. and federal civil rights laws.  Decedent MARKWHAN KITCHER-TUCKER had no spouse or children.  A Co-Successor in Interest declaration is filed herewith.

4.      Plaintiff SANVADA KITCHER is the father of Decedent MARKWHAN KITCHER-TUCKER and a resident of the State of California.  Plaintiff SANVADA KITCHER brings these claims individually and as Co-Successor in Interest for his son, Decedent

MARKWHAN KITCHER-TUCKER, pursuant to California Code of Civil Procedure §§ 377.10 *et seq.* and federal civil rights laws. A Co-Successor in interest declaration is filed herewith.

5.    Plaintiffs bring these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions. Plaintiffs also bring their claims individually and on behalf of Decedent MARKWHAN KITCHER-TUCKER on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, ADA, RA, federal and state civil rights law, and California law. Plaintiffs also bring these claims as Private Attorneys General, to vindicate not only their rights and MARKWHAN KITCHER-TUCKER's rights, but others' civil rights of great importance.

6.    Defendant CITY AND COUNTY OF SAN FRANCISCO ("CCSF") is a public entity, duly organized and existing under the laws of the State of California. Under its authority, the CCSF operates the San Francisco County Sheriff's Office ("SFSO") and the San Francisco County jails. At all relevant times, the CCSF's Department of Public Health was responsible for providing medical and mental healthcare services to pretrial detainees at San Francisco County jails, including MR. KITCHER-TUCKER, through their Jail Medical Services ("JMS") and Jail Behavioral Health Services ("JBHS") divisions.

7.    Defendant SHERIFF PAUL MIYAMOTO ("MIYAMOTO"), at all times mentioned herein, was employed by Defendant CCSF as Sheriff for the CCSF, and he was acting within the course and scope of that employment. In that capacity, Defendant MIYAMOTO was a policy making official for the CCSF. Further, Defendant MIYAMOTO was ultimately responsible for the provision of medical and mental health care to inmates at the CCSF jails, including assessment of inmates for medical emergencies and mental health needs, and all CCSF policies, procedures, and training related thereto. He is being sued in his individual capacity.

8.    Defendant JAIL CAPTAIN STEPHEN TILTON, at all times mentioned herein, was employed by the CCSF's Sheriff's Office as Jail Captain, in charge of County Jail No. 3, and was acting within the course and scope of that employment. At all relevant times, Defendant TILTON was a policy making official for County Jail No. 3, with authority delegated to him by the Sheriff, and responsible for all policies, procedures, supervision, and training at the jail. On information and

belief, MR. KITCHER-TUCKER was housed at County Jail No. 3 for a majority of his incarceration, including during the pertinent events discussed below.

9.    Defendant LOREN ROTH, M.D., at all times mentioned herein, was employed by Defendant CCSF's Jail Behavioral Health Services ("JBHS"), a division of the CCSF's Department of Public Health, as the Medical Director, and was responsible for the provision of psychiatric and mental health services to pretrial detainees at San Francisco County jails, including MR. KITCHER-TUCKER, and was acting within the course and scope of that employment. As set forth below, Defendant ROTH knew or had reason to know of MR. KITCHER-TUCKER's serious psychiatric needs, yet failed, among other things, to create a treatment plan for MR. KITCHER-TUCKER, failed to request or institute necessary suicide precautions for MR. KITCHER-TUCKER, including heightened monitoring and observations of him, failed to provide reasonable accommodations for MR. KITCHER-TUCKER's disabilities, including accommodations requested by MR. KITCHER-TUCKER, and approved of the order discontinuing MR. KITCHER-TUCKER's prescribed antipsychotic medication without requiring enhanced or ongoing monitoring of MR. KITCHER-TUCKER for mental health decompensation and suicidal behaviors, all with deliberate indifference to MR. KITCHER-TUCKER's serious psychiatric needs.

10.    Defendant TIANYI ZHANG, M.D., was at all material times employed by Defendant CCSF's Jail Behavioral Health Services, a division of the CCSF's Department of Public Health, as a psychiatrist, and acted within the course and scope of that employment. As set forth below, Defendant ZHANG knew or had reason to know of MR KITCHER-TUCKER's serious psychiatric needs, yet never created a treatment plan for him, never requested or instituted necessary suicide precautions for him, including heightened monitoring and observations of him, failed to provide reasonable accommodations for MR. KITCHER-TUCKER's disabilities, including accommodations requested by MR. KITCHER-TUCKER, and discontinued MR. KITCHER-TUCKER's prescribed antipsychotic medication without requiring ongoing monitoring of MR. KITCHER-TUCKER for mental health decompensation and suicidal behaviors, all with deliberate indifference to MR. KITCHER-TUCKER's serious psychiatric needs.

11.    All CCSF medical and mental health staff were responsible for properly assessing and classifying inmates, properly assessing and addressing the medical needs of inmates, properly

assessing and addressing the mental health needs of inmates, properly assessing and treating the serious medical needs of inmates, providing appropriate observation and a treatment plan for serious medical needs, including suicide prevention, care and treatment for mental illness and emotional disturbance, monitoring inmates, and summoning medical care when it was needed.

12.     Defendants DOES 1-20 ("DOE Defendants"), at all times mentioned herein, were employed by Defendant CCSF as correctional deputies, sergeants, supervisors, health care personnel, mental health care personnel, or other policy making officials at the jail, and were acting within the course and scope of that employment.  DOE Defendants are being sued in their individual capacities.

13.     Plaintiffs are ignorant of the true names and capacities of Defendants DOES 1-20 (DOE Defendants") and therefore sue these Defendants by such fictitious names.  Despite Plaintiffs' multiple and lawful requests for MR. KITCHER-TUCKER's jail custody records, including observation logs, incident reports, and other pertinent records, Defendant CCSF has refused to produce them.  Plaintiffs are informed and believe and thereon allege that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein.  Plaintiffs will amend their complaint to state the names and capacities of each DOE DEFENDANT when they have been ascertained.

14.     Plaintiffs are informed and believe and thereon allege that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiffs are further informed and believe and thereon allege that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged.  At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiffs' and Decedent's constitutional rights and other harm.

15.     The acts and omissions of the Defendants as set forth herein, were at all material times pursuant to the actual customs, policies, practices and procedures of CCSF.

16.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of CCSF.

17.     Plaintiffs timely and properly filed a tort claim with CCSF pursuant to California Government Code sections 910 et seq., and this action is timely filed within all applicable statutes of limitation.

18.     This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

## GENERAL ALLEGATIONS

19.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

20.     MARKWHAN KITCHER-TUCKER was a 28-year-old man who was diagnosed with schizophrenia.  At all times throughout his incarceration at San Francisco County jail, it was obvious that MR. KITCHER-TUCKER was severely mentally ill.  MR. KITCHER-TUCKER's mental illness was well known by Defendants from prior incarcerations at the jail and Welfare and Institutions Code § 5150 psychiatric holds at San Francisco General Hospital ("SFGH"), whose medical and mental health records were, at all material times, accessible to Defendant CCSF, and their employees and agents, through the San Francisco Department of Public Health's Epic electronic medical records system.

21.     On or about April 8, 2020, MR. KITCHER-TUCKER was arrested in San Francisco for a series of theft crimes and related charges arising out of his mental illness, and transported to San Francisco County jail located in San Bruno, California.  MR. KITCHER-TUCKER was initially quarantined for 14 days for signs and symptoms of COVID-19, before being transferred to the jail's general population.

22.     On May 7, 2020, CCSF Sheriff's Office ("SFSO") Sergeant Joseph Leonardini reported observing MR. KITCHER-TUCKER behaving oddly and requested that he be evaluated by Jail Behavioral Health Services ("JBHS") mental health staff.  Ray Bashista, L.M.F.T., evaluated MR. KITCHER-TUCKER and reviewed his medical and mental health records through the Epic electronic medical records system.  Mr. Bashista learned that MR. KITCHER-TUCKER reported

that he was diagnosed with schizophrenia during a previous jail incarceration and had two Welfare and Institutions Code § 5150 psychiatric holds at San Francisco General Hospital for being a danger to himself, to others, or gravely disabled due to a mental disorder.  Both of those emergency psychiatric holds had occurred within the past year.  In reviewing MR. KITCHER-TUCKER's medical and mental health records, Mr. Bashista should have also learned that Mr. KITCHER-TUCKER was prescribed antipsychotic medication following these incidents.  Mr. Bashista noted that MR. KITCHER-TUCKER's presentation and history suggested that he may be suffering from a mental disorder and, rather than create a treatment plan for him, or request that a physician conduct a psychiatric evaluation, Mr. Bashista simply planned to periodically check MR. KITCHER-TUCKER's adjustment to jail.

23.    On May 21, 2020, MR. KITCHER-TUCKER's criminal case was called and a doubt arose as to his competence; therefore, the **criminal proceedings against MR. KITCHER-TUCKER were suspended** and the case was referred by Honorable Judge Charles Crompton of the San Francisco County Superior Court to psychologist Amy Watt, Ph.D. for a Penal Code § 1368 competency evaluation.  The matter was continued for receipt of the Penal Code § 1368 Evaluation Report.

24.    By June 9, 2020, MR. KITCHER-TUCKER was exhibiting bizarre behavior, including yelling and talking to himself out loud.  Maria Creencia, R.N., assessed MR. KITCHER-TUCKER and noted that he displayed signs and symptoms of decompensating.  Nurse Creencia referred MR. KITCHER-TUCKER to JBHS for further evaluation.

25.    The next day, on June 10, 2020, Mr. Bashista, L.M.F.T. evaluated MR. KITCHER-TUCKER and again noted that he reported a past diagnosis of schizophrenia, had been described as odd, and had difficulty taking in information.  Again, Mr. Bashista only planned to check on MR. KITCHER-TUCKER the following week.

26.    On June 11, 2020, MR. KITCHER-TUCKER was evaluated by court appointed alienist, psychologist Amy T. Watt, PhD., who reported in her Penal Code § 1368 report dated June 22, 2020, that MR>. KITCHER-TUCKER was unable to explain why he was arrested, did not

1    understand the charges against him or the purpose of a trial, nor the roles of the lawyers involved,

2    he did not know what a jury was, nor did he understand plea bargains.  It should have been obvious

3    to Dr. Watt that MR. KITCHER-TUCKER did not have a sufficient level of competency to assist

4    his lawyer in his defense or an understanding of the proceedings against him.  Nonetheless, because

5    MR. KITCHER-TUCKER allegedly did not exhibit serious psychological symptoms during her

6    evaluation that day, and despite his history of serious mental health issues, prior hospitalizations,

7    and prescribed antipsychotic medications, Dr. Watt found him to be competent to stand trial.

8         27.    Notwithstanding Dr. Watt's report, throughout the next few weeks, MR. KITCHER-

9    TUCKER's psychiatric condition deteriorated as jail mental health staff continued to observe MR.

10   KITCHER-TUCKER talking to himself and described him as vulnerable and odd, anti-social,

11   disruptive, teenage-like, irritable, and with limited insight.

12        28.    On July 4, 2020, MR. KITCHER-TUCKER informed Marissa DeGuzman, R.N., that

13   he was depressed and suicidal and he made a very reasonable request for medication to treat his

14   disability and depression.  Ian Albert, L.M.F.T., assessed MR. KITCHER-TUCKER and attributed

15   his psychiatric condition to "poor adjustment to custody" and failed to request any psychiatric

16   evaluation or medication assessment for MR. KITCHER-TUCKER.  On information and belief,

17   MR. KITCHER-TUCKER continued to be housed in a cell with a bunk bed and items that could be

18   used to harm oneself, rather than a safety cell, and he was provided no closer monitoring or suicide

19   precautions.

20        29.    Jail mental health staff continued to observe obvious signs of Mr. KITCHER-

21   TUCKER's declining mental health.  On August 4, 2020, MR. KITCHER-TUCKER, clearly

22   suffering from a severe mental illness, told Vivian Wan, L.M.F.T., "I need help.  I'm having a

23   mental breakdown."  At this time, Ms. Wan reported that MR. KITCHER-TUCKER was acting

24   very odd, his cell was in total disarray, with food and garbage all over the floor, and he was engaged

25   in erratic behavior, such as yelling, banging on his cell door, exposing himself to jail staff, and

26   unable to formulate complete sentences.

27

28

30.    Later that day, Mr. KITCHER-TUCKER was seen by Jacob Izenberg, M.D., who described him as strange and odd and noted that MR. KITCHER-TUCKER reported, "Sometimes I see blue and black and can't breathe," and he described an inhaler on the floor of his cell as "cinnamon." Although Dr. Izenberg noted that MR. KITCHER-TUCKER's behavior could be consistent with schizophrenia or a developmental disorder such as autism spectrum, he failed to create a treatment plan to assess and properly diagnose MR. KITCHER-TUCKER's serious psychiatric needs.

31.    On August 6, 2020, psychiatrist Ira D. Glick, M.D., conducted a second competency evaluation of MR. KITCHER-TUCKER at the request of MR. KITCHER-TUCKER's public defender. In his report dated August 7, 2020, Dr. Glick opined that MR. KITCHER-TUCKER most likely suffered from Chronic Schizophrenia and Substance Use Disorder, appeared to have severe thought disorder, and that MR. KITCHER-TUCKER did not have the ability to understand the nature of the criminal proceedings to assist his counsel in his case nor the capacity to make decisions regarding his medication. Unlike Dr. Watt, Dr. Glick found MR. KITCHER-TUCKER incompetent to stand trial.

32.    On August 8, 2020, SFSO deputies transferred MR. KITCHER-TUCKER to a segregated cell after he had difficulties with jail staff and inmates in general population housing, likely due to his mental health issues. It has been well known in correctional healthcare for decades that housing a severely mentally ill inmate alone in segregation, which is essentially solitary confinement, endangers the patient's mental health and greatly increases the risk of further morbidity and suicide. Throughout the rest of his jail incarceration until his death, except for the times he was in the hospital or in a safety cell, Defendants housed MR.KITCHER-TUCKER in segregated, solitary confinement.

33.    On September 2, 2020, the Court ordered a supplemental Penal Code § 1368 report from the initial alienist, Dr. Watt. As the Court awaited the results from the third competency evaluation, MR. KITCHER-TUCKER's mental health continued to deteriorate.

34.     On September 3, 2020, MR. KITCHER-TUCKER was assessed by Defendant LOREN ROTH, M.D. ("ROTH"), and Ian Albert, L.M.F.T.  On information and belief, Defendant ROTH knew or had reason to know MR. KITCHER-TUCKER was suffering from a serious mental illness and was aware of his declining mental health throughout his incarceration, including the documented failures of the mental health staff to properly treat and assess MR. KITCHER-TUCKER, when she evaluated him.  Defendant ROTH reported that MR. KITCHER-TUCKER exhibited disorganized thought process, paranoia, and agitation, and was "clearly psychotic." Defendant ROTH diagnosed MR. KITCHER-TUCKER with Psychotic Disorder, yet failed to prescribe him any antipsychotic medication to help treat his psychosis, failed to create a treatment plan for MR. KITCHER-TUCKER, and failed to request or institute any increased observation of MR. KITCHER-TUCKER, all with deliberate indifference to his serious psychiatric needs.

35.     The following day, on September 4, 2020, MR. KITCHER-TUCKER was observed exhibiting agitated behavior, including yelling and banging in his cell, displayed disorganized thoughts, and was standing naked in his cell while asking staff to "help him," but was unable to articulate the type of help he needed.  MR. KITCHER-TUCKER was placed in a safety cell before being transferred to San Francisco General Hospital's ("SFGH") 7L psychiatric ward the next day on a Welfare and Institutions Code § 5150 psychiatric hold for being a danger to others and gravely disabled.

36.     The San Francisco Sheriff's Office maintains a locked security unit at SFGH for provision of inpatient services to San Francisco County jail inmates whose medical and mental health needs require a higher level of care than is available at the jails.  SFGH Ward 7L is a 12-bed psychiatric inpatient unit for patients with acute psychiatric conditions and for patients who meet the Welfare and Institutions Code § 5150 criteria for being a danger to themselves, to others, or gravely disabled, due to a mental disorder.

37.     At the hospital, MR. KITCHER-TUCKER received inpatient psychiatric stabilization treatment, including occupational therapy and antipsychotic medication.  The hospital staff diagnosed MR. KITCHER-TUCKER with schizophrenia, but noted that he was calm and

cooperative as he appeared to benefit from the medication, psychotherapies and individualized treatment he received.

38.     On September 9, 2020, four days later, MR. KITCHER-TUCKER was discharged from the SFGH's psychiatric unit and returned to the jail.  Upon arriving back at the jail, jail mental health staff immediately noted that MR. KITCHER-TUCKER remained symptomatic and disorganized, and that his psychosis had become increasingly apparent.

39.     On September 10, 2020, Defendants learned that MR. KITCHER-TUCKER's attorney declared a doubt as to his competency to stand trial, and that he was assessed by a psychiatrist who found him incompetent to stand trial and an earlier psychologist who found him competent to stand trial.  On information and belief, all CCSF Defendants knew or had reason to know that MR. KITCHER-TUCKER's mental capacity to stand trial was at issue in his court proceedings.

40.     On September 10, 2020, Defendant ROTH assessed MR. KITCHER-TUCKER and again noted that he was "clearly psychotic" and was declining to take the antipsychotic medication he had taken at the hospital.  Defendant ROTH failed to create a treatment plan for MR. KITCHER-TUCKER, failed to request or institute increased monitoring of MR. KITCHER-TUCKER, even though she knew MR. KITCHER-TUCKER was "clearly psychotic" and not compliant with his medication order.  Defendant ROTH simply scheduled a follow up visit for two weeks later, with no further action taken to assess and address MR. KITCHER-TUCKER's deteriorating mental health, all in deliberate indifference to his serious psychiatric needs.

41.     On September 17, 2020, MR. KITCHER-TUCKER was interviewed again by the court-appointed alienist, Dr. Watt, for a supplemental evaluation.  In her supplemental report, Dr. Watt acknowledged MR. KITCHER-TUCKER's recent hospitalization for being a danger to others and gravely disabled, and that MR. KITCHER-TUCKER informed her he was "thinking about hanging himself recently."  Nevertheless, Dr. Watt determined that MR. KITCHER-TUCKER was competent to stand trial and attributed his current and obvious psychological symptoms to past drug and alcohol use.

42.     On September 19, 2020, Mr. KITCHER-TUCKER informed SFSO Deputy De Los Reyes that he wanted to hurt himself, and Deputy De Los Reyes reported that MR. KITCHER-

TUCKER placed toilet paper on his cell window to obstruct the view into his cell.  SFSO deputies then transferred MR. KITCHER-TUCKER to a safety cell.  The SFSO deputies and medical staff reported that MR. KITCHER-TUCKER had "periods of calm, then periods of great agitation, yelling, and making nonsensical statements."   When MR. KITCHER-TUCKER was assessed in the safety cell by Ray Bashista, L.M.F.T., he stated that his suicidal statements are sporadic and that he hears voices.  MR. KITCHER-TUCKER appeared to recognize his declining mental health and expressed interest in increasing the dosage for his antipsychotic medication.

43.     On September 21, 2020, MR. KITCHER-TUCKER was again transported to San Francisco General Hospital on a § 5150 psychiatric hold for being a danger to others after he became combative with jail staff, exhibited increased unpredictable and hostile behavior, was observed talking to himself, and showed clear signs of decompensation.  It is well known in the mental health profession that symptoms of psychosis can precipitate aggressive behavior.  As noted by SFGH hospital staff, MR. KITCHER-TUCKER's assaultive and unpredictable behavior was believed to be due to his paranoia caused by his mental illness.

44.      During his second hospitalization, MR. KITCHER-TUCKER again received psychiatric occupational therapy, was medication compliant, and participated in leisure activities.  The hospital staff noted that MR. KITCHER-TUCKER's risk of harming himself decreased while he was stable on psychiatric medication.

45.     After his return to the jail on September 25, 2020, MR. KITCHER-TUCKER watched a neighboring inmate attempt suicide.  It is well recognized in mental health that a person who sees another person attempt or commit suicide is at increased risk of suicide, especially if he suffers from mental illness.  After seeing the suicide attempt, MR. KITCHER-TUCKER informed Vivian Wan, L.M.F.T. that, "I feel like I can relate though.  I have nothing to live for.  Being in here isn't good.  I put my mattress on the floor because sometimes I want to die."  MR. KITCHER-TUCKER also requested reasonable accommodations for his mental illness and access to a mental health program and daily mental health assessments: "I need someone to talk to me every day for one hour," and also requested stronger antipsychotic medication.  On information and belief, Defendants ROTH and TIANYI ZHANG, M.D. ("ZHANG") knew or should have known of these obvious cries for help, yet failed to properly assess and address MR. KITCHER-TUCKER's mental

health needs, failed to create a treatment plan for MR. KITCHER-TUCKER, failed to provide MR. KITCHER-TUCKER with reasonable accommodations for his mental illness, including the supportive daily psychotherapy he requested, and failed to request or institute any increased observation of MR. KITCHER-TUCKER, all with deliberate indifference to his serious psychiatric needs.

46. On September 28, 2020, MR. KITCHER-TUCKER was evaluated by Defendant ZHANG and reported that he witnessed a neighboring inmate attempt suicide a few days earlier and was currently wondering if his neighbor was better off, and wondering if he would also be better off dead. He further informed Defendant ZHANG, "I feel like I have been experiencing a lot of psychological trauma and haven't been getting care for it." Although Defendant ZHANG reported that MR. KITCHER-TUCKER endorsed passive suicidal ideation and signs of paranoia, she failed to create a treatment plan for him, failed to provide him required psychotherapeutic care, and failed to request suicide precautions, including heightened monitoring or placement in a safety cell, all with deliberate indifference to MR. KITCHER-TUCKER's serious psychiatric needs.

47. On October 6, 2020, MR. KITCHER-TUCKER informed Annette Pakhchian, A.S.W., and jail deputies, that he "wanted to hang himself like his neighbor had." MR. KITCHER-TUCKER was again placed in a safety cell for being a danger to himself. Mr. KITCHER-TUCKER subsequently recanted his suicidal statements and claimed that he just wanted respite from his segregated cell. By then, he had been in solitary confinement continuously since at least August 20, 2021. The next day, MR. KITCHER-TUCKER was discharged from the safety cell by Ms. Pakhchian with no treatment plan and no plans for increased monitoring or suicide precautions. On information and belief Defendants ROTH and ZHANG were aware of MR. KITCHER-TUCKER's suicidal statements and safety cell placement and failed to create a treatment plan for MR. KITCHER-TUCKER or to request or institute increased observation and necessary suicide precautions for MR. KITCHER-TUCKER upon his release from the safety cell, all with deliberate indifference to his serious psychiatric needs.

48. On October 12, 2020, Defendant ZHANG noted that Mr. KITCHER-TUCKER declined his antipsychotic medication more than 50% of the time and that he was demonstrating more disorganization in speech and behavior, was delusional, and was responding to internal

stimuli.  Defendant ZHANG further noted that "he's markedly different from our last encounter with each other two weeks ago."  Defendant ZHANG suspected MR. KITCHER-TUCKER's changes in behavior were due to his recent refusals to take his prescribed antipsychotic medication.

49.     On October 15, 2020, MR. KITCHER-TUCKER was placed in a safety cell again for attempting to fight with his cellmate.  Ian Albert, L.M.F.T., reported that MR. KITCHER-TUCKER appeared to be internally occupied, was mumbling to himself, and becoming increasingly hostile.  Mr. Albert further noted that MR. KITCHER-TUCKER had been refusing his antipsychotic medication over the past two weeks and appeared to be decompensating.  That same day, MR. KITCHER-TUCKER was transported to San Francisco General Hospital for a third § 5150 psychiatric hold for being a danger to others.  Hospital staff found him to be a danger to others as a result of his mental illness.

50.     On October 16, 2020, SFGH staff held a *Riese* hearing[1] and determined, by clear and convincing evidence, that MR. KITCHER-TUCKER lacked capacity to make his own decisions about antipsychotic medication, and he needed to be involuntarily medicated.  On October 19, 2020, hospital staff administered antipsychotic medication to MR. KITCHER-TUCKER intravenously and Mr. KITCHER-TUCKER could not refuse treatment.  His next dose was scheduled for November 16, 2020.

51.     Also on October 19, 2020, while MR. KITCHER-TUCKER remained hospitalized on the § 5150 hold, Judge Charles Crompton of the San Francisco County Superior Court found MR. KITCHER-TUCKER to be incompetent to stand trial ("IST") pursuant to Penal Code § 1368. The Court ordered a placement report to be submitted by the Golden Gate Conditional Release Program ("CONREP"), a California Department of State Hospitals statewide system of community-based treatment, evaluation, and supervisory services that provides a written recommendation to the Court as to whether individuals declared IST, and other commitment types, should undergo

---

[1] A *Riese* hearing is held to determine whether a patient can refuse treatment with medication. The *Riese* case provides that a patient who is to be involuntarily medicated must be proven to lack capacity by "clear and convincing evidence."  *Riese v St. Mary's Hosp. & Med. Ctr.*, 209 CA3d 1303, 1322 (1987).

outpatient treatment or be committed to a state hospital, or any other treatment facility, under California Penal Code § 1370.

52.    On October 20, 2020, MR. KITCHER-TUCKER was returned to the jail and continued refusing his antipsychotic medication.

53.    By October 30, 2020, MR. KITCHER-TUCKER was placed in a safety cell again after making suicidal statements, as he continued to exhibit disorganized thinking, poor judgment, and impulsive behavior.  MR. KITCHER-TUCKER was discharged from the safety cell the next day by Vivian Wan, L.M.F.T., with no treatment plan and no plans for increased monitoring or suicide precautions.

54.    On November 4, 2020, Defendant ROTH saw MR. KITCHER-TUCKER, and MR. KITCHER-TUCKER reported that he believed his three recent psychiatric hospitalizations were for medical reasons only.  He continued to refuse his prescribed psychiatric medications.  Defendant ROTH noted that MR. KITCHER-TUCKER had potential for decompensation, but did nothing to properly assess and address MR. KITCHER-TUCKER's mental health needs, failed to create a treatment plan for MR. KITCHER-TUCKER, failed to request continuance of involuntary antipsychotic medications for MR. KITCHER-TUCKER, and failed to request or institute any increased observation of MR. KITCHER-TUCKER, all with deliberate indifference to MR. KITCHER-TUCKER's serious psychiatric needs.

55.    On November 12, 2020, CONREP Community Program Director, Elizabeth Martin, Ph.D., provided a placement evaluation report to the Court and recommended that MR. KITCHER-TUCKER be referred for inpatient treatment with the California Department of State Hospitals ("DSH") for competency restoration.  That same day, mental health staff documented in MR. KITCHER-TUCKER's medical records that they had received notification that he had been found incompetent to stand trial due to his severe psychiatric illness.

56.    On or about November 13, 2020, MR. KITCHER-TUCKER'S mother, Plaintiff Latoya Sparks posted $2,500 to a bail bonding agency for MR. KITCHER-TUCKER's release.   On information and belief, the jail released Mr. KITCHER-TUCKER the next day.  Plaintiff Sparks met MR. KITCHER-TUCKER at the Greyhound bus station in San Francisco and brought him home.

57.     On November 16, 2020, the criminal case was called with MR. KITCHER-TUCKER's appearance waived, and upon receipt of the report from CONREP, SF Superior Court Judge Crompton committed MR. KITCHER-TUCKER to the California Department of State Hospitals for competency restoration.  The Court also ordered that the DSH treatment facility may involuntarily administer psychotropic medication.  MR. KITCHER-TUCKER had fundamental constitutional due process rights to treatment to restore him to competency, and to be free from incarceration after his criminal charges were suspended.  Although the criminal proceedings remained suspended, MR. KITCHER-TUCKER was remanded to the custody of the Sheriff for CCSF, Defendant PAUL MIYAMOTO, for delivery to a DSH facility.  On information and belief, all Defendants herein had actual knowledge of this commitment order, its contents and requirements.

58.     In the event that CCSF and DSH disobeyed the Court Order for MR. KITCHER-TUCKER's admission, then pursuant to Due Process Clause of the Fourteenth Amendment to the U.S Constitution, California Penal Code § 1600, and other authorities, CCSF, their employees and agents, and the individually named Defendants herein, nonetheless, remained responsible for the care, treatment, and medical needs of their pretrial detainee, MARKWHAN KITCHER-TUCKER, to provide such necessary care and/or secure such care from any other available public or private treatment facility approved by the community program director that would promote MR. KITCHER-TUCKER's speedy restoration to mental competence, or have him placed on outpatient status, as specified in Penal Code § 1600.

59.     Both the Due Process Clause of the Fourteenth Amendment and California statutory law mandate that a criminal defendant who, because of a mental disorder or developmental disability, lacks the ability to assist counsel and to understand the nature of the criminal court proceedings cannot be tried or sentenced for a crime. *Indiana v. Edwards*, 554 U.S. 164, 169-170 (2008); Cal. Pen. Code § 1367(a).  If, after a trial or by stipulation, a defendant is found mentally incompetent or developmentally disabled, the trial court must suspend criminal proceedings and either order that the defendant be admitted to a treatment facility to "promote the defendant's speedy attainment of mental competence," or place the defendant on outpatient status. Cal. Pen. Code §§ 1370(a)(1)(B), 1370.1(a)(1)(B).

60.     Criminal defendants who have been found incompetent to stand trial ("IST") have a Constitutional right to treatment to restore them to competency so that they may proceed to trial or otherwise have their charges adjudicated.  Under the Due Process Clause of the Fourteenth Amendment, "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *Oregon Advocacy Center v. Mink,* 322 F.3d 1101, 1120(9th Cir. 2003) ("Incapacitated criminal defendants have a high risk of suicide, and the longer they are deprived of treatment, the greater the likelihood they will decompensate and suffer unduly.").  Recently, the California Court of Appeals in *Stiavetti v. Clendenin*, 65 Cal.App.5th 691, 695 (2021), held that due process requires the commencement of substantive competency services for IST patients within 28 days of service of the commitment order.

61.     It is widely known by government officials at both the local and state levels that IST "defendants usually get worse the longer they wait for admission to a Mental Health hospital."  Sen. Rules Com., Off. Of Sen. Floor Analyses, analysis of Sen. Bill No. 568 (2007-2008 Reg. Sess.).  In a 2013 County of Napa position paper on legislation relating to Napa State Hospital, Napa County explained that one of the most severe consequences of housing incompetent defendants in county jails is the "decompensation they exhibit when moved to the jail and the deterioration in their condition when they are kept in a segregated, non-clinical environment."

62.     It is well known in correctional medicine that severely mentally ill and IST pretrial detainees decompensate when they are held in jail instead of a hospital.  In a hospital, the patient has a treatment team that may include a psychiatrist, psychologist, nurse, social worker, and psychiatric technician, and receives both pharmacological and nonpharmacological treatment.  Also, as in MR. KITCHER-TUCKER's case, the patient may receive involuntary medications after a constitutional hearing determining their incompetence to make their own medical decisions by clear and convincing evidence.

63.     When Mr. KITCHER-TUCKER's criminal case was called on November 23, 2020, the Court learned that he was no longer in custody.  The Court issued a bench warrant for his return to jail and vacated the Order committing him to the Department of State Hospitals.

64.     On or about November 27, 2020, Mr. KITCHER-TUCKER's mother, Plaintiff LATOYA SPARKS, brought him back to the jail pursuant to the instructions of MR. KITCHER-TUCKER's public defender.  Upon his return to jail, MR. KITCHER-TUCKER continued to refuse antipsychotic medication, and reported to mental health staff that he was hearing voices and was depressed about being away from his family.  The jail's mental health staff continued to report that MR. KITCHER-TUCKER had the potential for decompensation, had poor insight into his mental illness, and continued exhibiting disorganized and odd behavior.  On information and belief, Defendants ROTH and ZHANG were aware of MR. KITCHER-TUCKER's declining mental condition at this time, yet failed to properly assess and address MR. KITCHER-TUCKER mental health needs, failed to create a treatment plan for MR. KITCHER-TUCKER, failed to take the steps necessary to continue his involuntary antipsychotic medications, and failed to request or institute any increased observation of MR. KITCHER-TUCKER, all with deliberate indifference to his serious psychiatric needs.

65.     On November 30, 2020, the Court discharged the bench warrant and continued the case for status of MR. KITCHER-TUCKER's transport to a DSH hospital.  The Court did not specifically reinstate the Commitment Order, but continued to reference it in subsequent court proceedings.  Each Defendant remained fully aware of MR. KITCHER-TUCKER's serious psychiatric needs and obvious mental illness.  On information and belief, each Defendant also knew that no provisions were being made to transport MR. KITCHER-TUCKER to a state hospital.  His serious psychiatric needs were fully Defendants' responsibility.

66.     Over the next month, Mr. KITCHER-TUCKER refused all but one dose of his antipsychotic medication.  Defendants took no steps to ensure that MR. KITCHER-TUCKER receive the psychiatric medication he needed, despite knowing he was incompetent to make his own decisions about medication, and did nothing to transfer MR. KITCHER-TUCKER to a more appropriate setting such as a psychiatric hospital or locked psychiatric facility, where he could receive the treatment and medications he required.

67.     By December 28, 2020, with full knowledge that MR. KITCHER-TUCKER suffered from untreated schizophrenia, was clearly psychotic, was a danger to himself and others, had expressed suicidal ideations on multiple occasions, including after he witnessed his neighboring

cellmate attempt suicide, had been declared IST and committed to a DSH hospital for competency restoration, and had been placed on three §5150 psychiatric holds at San Francisco General Hospital, Defendant ZHANG chose to discontinue MR. KITCHER-TUCKER's psychiatric medication order with no measures taken for continued monitoring of MR. KITCHER-TUCKER and with no treatment plan whatsoever, in deliberate indifference to his serious psychiatric needs. Discontinuation of the medication order created further isolation and deprivation of human contact for MR. KITCHER-TUCKER, as now no mental health care personnel would even come to see him for medications. Defendant ZHANG's only plan for MR. KITCHER-TUCKER was to follow up in four weeks. Defendant ROTH approved of Defendant ZHANG's plan without ever assessing MR. KITCHER-TUCKER herself, and in fact, had not assessed Mr. KITCHER-TUCKER since November 4, 2020.

68.     Defendants ROTH and ZHANG never provided MR. KITCHER-TUCKER with any consistent psychiatric or mental health care or even consistent supportive counseling or a mental health treatment plan. Mr. KITCHER-TUCKER continued to be housed alone in a segregated cell, essentially in solitary confinement, with a bunk bed and items that he could use to harm himself. It is generally accepted throughout correctional health care that inmates at risk of suicide who are housed alone in segregated cells must be under constant observation.

69.     At the time Defendant ZHANG discontinued the medication order, MR. KITCHER-TUCKER had been anticipating his transfer to a DSH hospital, and asked Defendant ZHANG questions about what to expect there. Had he been promptly transferred to a DSH hospital pursuant to the Commitment Order, or had Defendants arranged for MR. KITCHER-TUCKER to be transferred to any other hospital or psychiatric facility, Mr. KITCHER-TUCKER would have received a wide range of psychiatric services and mental healthcare, including individual and group therapy, and socialization groups as tolerated. MR. KITCHER-TUCKER could have also been administered psychotropic drugs involuntarily to treat his psychosis per the court's Commitment Order or the *Riese* findings.

70.     Following Defendant ZHANG's discontinuation of MR. KITCHER-TUCKER's psychiatric medication order, no mental health care personnel ever assessed MR. KITCHER-

TUCKER again.  On information and belief, CCSF DOE Defendants, including correctional deputies, sergeants, and supervisors failed to conduct the required observations of MR. KITCHER-TUCKER, in violation of California law and generally accepted standards requiring regular, logged, observations of all inmates.  In addition, generally accepted standards in corrections and correctional healthcare require that an inmate who is at risk of suicide and housed alone in a segregated cell or solitary confinement must be under constant observation.  Defendants persistently housed MR. KITCHER-TUCKER in solitary confinement and without necessary observation.

71.    On January 10, 2021, after having gone nearly two weeks without any mental health treatment or assessments whatsoever, MR. KITCHER-TUCKER was found hanging by a sheet from the top bunk of his segregated cell.  After life-saving measures were exhausted, MR. KITCHER-TUCKER was pronounced dead at 2:10 p.m.  The cause of death was determined to be "asphyxia" due to "hanging by ligature."

72.    All Defendants, including currently unidentified deputies, jail administrators, mental health personnel, and/or law enforcement officers (DOES), knew or had reason to know that MR. KITCHER-TUCKER was suffering from serious psychiatric illness, had serious psychiatric needs, and consistently at a high risk of suicide, and all Defendants were deliberately indifferent to those serious psychiatric needs, and denied MR. KITCHER-TUCKER necessary psychiatric care and reasonable accommodations for his mental disability.  All Defendants, including currently unidentified deputies, jail administrators, mental health personnel, and/or law enforcement officers (DOES), were deliberately indifferent to MR. KITCHER-TUCKER's safety and psychiatric needs in their jail placement, monitoring, assessment, custody, and care decisions.  Due to such deliberate indifference, MR. KITCHER-TUCKER's psychiatric condition deteriorated and he committed suicide.

73.    MR. KITCHER-TUCKER's death was proximately caused by each of the Defendants' deliberate indifference to his serious mental health needs, as set forth above.

74.    MR. KITCHER-TUCKER's death was proximately caused by Defendant CCSF's failure to reasonably train and supervise jail deputies and health care personnel tasked with

screening, admitting, observing, monitoring, and protecting MR. KITCHER-TUCKER.  These substantial failures reflect Defendant CCSF's policies implicitly or directly ratifying and/or authorizing the deliberate indifference to serious medical needs and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline deputy sheriffs and health care personnel employed by Defendants CCSF, Sheriff PAUL MIYAMOTO ("MIYAMOTO"), and Captain STEPHEN TILTON with deliberate indifference to inmates' serious medical needs.

75.    Decedent's death also was proximately caused by Defendants' failure to reasonably staff, train, supervise, and equip their medical and mental healthcare staff in the proper and reasonable screening, assessment, and care of severely mentally ill, emotionally disturbed inmates; failure to implement and enforce generally accepted, lawful policies and procedures at the jail; and deliberate indifference to the serious psychiatric needs of inmates such as MARKWHAN KITCHER-TUCKER.  These substantial failures reflect Defendant CCSF's policies implicitly ratifying and/or authorizing the deliberate indifference to serious medical needs by their medical and mental healthcare staff and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline medical and mental healthcare staff employed by Defendants.

76.    At all material times, and alternatively, the actions and omissions of each Defendant were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately indifferent to Decedent's and Plaintiffs' rights, done with actual malice, grossly negligent, negligent, and objectively unreasonable.

77.    As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, to the extent permitted and pled by the various legal claims set forth below, Plaintiffs sustained the following injuries and damages, past and future, among others:

a.    Wrongful death of MARKWHAN KITCHER-TUCKER, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

b.    Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

c.    Plaintiffs' emotional distress [individual familial association claims];

d.   MARKWHAN KITCHER-TUCKER's hospital and medical expenses, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq.;

e.   MARKWHAN KITCHER-TUCKER's coroner's fees, funeral and burial expenses, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq.;

f.   Violation of MARKWHAN KITCHER-TUCKER's constitutional rights, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq. and federal civil rights law;

g.   MARKWHAN KITCHER-TUCKER's loss of life, pursuant to federal civil rights law;

h.   MARKWHAN KITCHER-TUCKER's conscious pain and suffering, pursuant to federal civil rights law;

i.   All damages, penalties, and treble damages recoverable under 42 U.S.C. §§ 1983 and 1988, Cal Civil Code §§ 52 and 52.1 *et seq.* and as otherwise allowed under California and United States statutes, codes, and common law.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**PLAINTIFFS AGAINST DEFENDANTS MIYAMOTO, TILTON,**
**<u>ROTH, ZHANG, and DOES 1-20</u>**

78.   Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

79.   By the actions and omissions described above, Defendants Sheriff PAUL MIYAMOTO, Jail Captain STEPHEN TILTON, Jail Medical Director LOREN ROTH, M.D., TIANYI ZHANG, M.D., and DOES 1-20, acting under the color of state law in their individual capacities, deprived MR. KITCHER-TUCKER of the right to be free from an unreasonable ongoing seizure as a pretrial detainee in the San Francisco County Jail, as secured by the Fourth and Fourteenth Amendments, and deprived MR. KITCHER-TUCKER as a pretrial detainee of the rights, privileges, and immunities secured by the Fourteenth Amendment by subjecting him, or through their deliberate indifference, allowing others to subject him, to delay and denial of access to medical or mental health care for a serious, but treatable, medical or mental health condition.

80.    The listed Defendants knew that MR. KITCHER-TUCKER's medical condition was serious, but treatable, and knew or must have known that, pursuant to the Commitment Order and the Court's and General Hospital's finding of his incompetence, he required access and delivery to urgently needed medical/mental health care and psychiatric medications; Defendants further had a duty to provide MR. KITCHER-TUCKER reasonable security and safe, appropriate housing and monitoring to accommodate his mental health condition.

81.    The listed Defendants knew or must have known that a Court of competent jurisdiction had ordered that MR. KITCHER-TUCKER be delivered to – and admitted to – DSH, for treatment and care for his serious, but treatable, mental health conditions, which Defendants knew or must have known that, if not treated, would worsen and cause MR. KITCHER-TUCKER harm or death.

82.    The listed Defendants ignored, delayed, or denied to MR. KITCHER-TUCKER's urgently needed medical and psychiatric care and treatment.  As a result of the Defendants' deliberate indifference to both MR. KITCHER-TUCKER's need for medical care and treatment and his mental condition, Plaintiffs suffered damages and deprivation of constitutional rights, as described herein.

83.    By the actions and omissions described above, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiffs and Decedent of the following well-settled constitutional rights that are protected by the First, Fourth, and Fourteenth Amendments to the U.S. Constitution:

        a.    The right to be free from an unreasonable ongoing seizure as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments;

        b.    The right to be free from deliberate indifference to MR. KITCHER-TUCKER's serious medical needs while in custody and confined in jail as a pretrial detainee, as secured by the Fourteenth Amendment;

        c.    The rights and liberty interests, as an incapacitated criminal defendant, to freedom from incarceration and to timely, restorative treatment, as secured by the Fourteenth Amendment;

d. The right to be free from wrongful government interference with familial relationships and Plaintiffs' rights to companionship, society, and support, as secured by the First and Fourteenth Amendments.

84.    The listed Defendants' failure to intervene, prevent, or stop the constitutional violations by others, when Defendants were in a position to so intervene while such violations were occurring, also renders such Defendant(s) liable for these violations.

85.    Defendants subjected Plaintiffs to their wrongful conduct, depriving Plaintiffs and Decedent of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs (Individually and on behalf of MARKWHAN KITCHER-TUCKER) and others would be violated by their acts and/or omissions.

86.    As a proximate result of the foregoing wrongful acts and/or omissions, Plaintiffs sustained injuries and damages, as set forth above, in ¶ 77.  Plaintiffs are therefore entitled to general and compensatory damages in an amount to be proven at trial.

87.    In committing the acts alleged above, the individually named Defendants and DOE Defendants acted maliciously and/or engaged in wanton and reckless disregard for the rights, safety, and emotional wellbeing of Plaintiffs and Decedent, and by reason thereof, Plaintiffs are entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983, California Code of Civil Procedure §§ 377.20 et seq, and other state and federal law against these individual Defendants; no punitive damages are sought directly against CCSF or against Sheriff Miyamoto in his official capacity.

88.    Plaintiffs are also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988 and other applicable California codes and laws.

### SECOND CAUSE OF ACTION
#### (*Monell* and Supervisory Liability- 42 U.S.C. § 1983)
#### PLAINTIFFS AGAINST DEFENDANTS CCSF, MIYAMOTO, TILTON, ROTH, and DOES 1-20

89.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

90.    Defendants SHERIFF PAUL MIYAMOTO, JAIL CAPTAIN STEPHEN TILTON, MEDICAL DIRECTOR LOREN ROTH, M.D., and DOES 1-20, as well as other employees or officers employed by or acting on behalf of Defendants CCSF, each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights and serious medical needs of MR. KITCHER-TUCKER.  Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinates from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights.  Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of Decedent's rights.

91.    Plaintiffs allege, upon information and belief, the unconstitutional actions and/or omissions of the individually named CCSF Defendants and the personnel acting on behalf of Defendant CCSF were pursuant to the following customs, policies, practices and/or procedures of CCSF, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policy making officials for CCSF and its Sheriff's Office and Health Department, including, but not limited to, Defendants SHERIFF PAUL MIYAMOTO, JAIL CAPTAIN STEPHEN TILTON, LOREN ROTH, M.D., and DOES 1-20:

> a.  To deny inmates at CCSF's jails access to appropriate, competent, and necessary care for serious medical and psychiatric needs, including, as described herein, their failure to provide appropriate and competent mental health care;

b.  To fail to properly classify, house, and/or monitor inmates suffering from mental health disabilities, including placement on suicide watch with proper suicide precautions, including failing to consider in any way the clear and obvious danger of placing inmates at risk of suicide in cells with means to hang and injure themselves (including bunk beds, horizontal bars, clothing, and ligature materials) and without constant observation as required by generally accepted correctional policies or the frequent, logged observation required by law;

c.  To fail to institute proper procedures and training to coordinate inmate assessment, placement, suicide watch decisions, and care with jail physician, jail psychiatrist, court, and jail corrections staff where there was an obvious need for such;

d.  To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures for handling, housing, and caring for mentally ill and/or emotionally disturbed inmates at CCSF jails, including alternatives to placing such ill and disturbed inmates in need of treatment in solitary confinement segregation cells that are intended and used to punish inmates, with the obvious consequence that the mental health needs of such inmates remain unaddressed and are in fact aggravated and increased by such punitive treatment;

e.  To fail to provide timely restorative treatment to incapacitated criminal defendants including transferring the defendant to a psychiatric hospital or locked psychiatric facility;

f.  To fail to provide for the continuation of involuntary medications after a *Riese* determination of incompetence in addition to a Court's determination of incompetence;

g.  To fail to provide requested reasonable accommodations for severely mentally ill inmate-patients, such as accommodating MR. KITCHER-TUCKER's request for one hour of interpersonal contact per day due to his serious mental illness;

h.  To allow employees to fail to institute required treatment plans for patients;

i.  To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (h) above, when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiffs, Decedent, and the public, and in the face of an obvious need for such policies, procedures, and training programs.

92.    In the alternative, upon information and belief, Defendant CCSF may have instituted policies or training addressing some or all the topics listed above, but with deliberate indifference to detainees' rights, failed to properly oversee, enforce, and/or properly carry out such policies and/or training.

93.     The above-described customs, policies, practices, and/or procedures of the CCSF were a moving force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in Count 1.

94.     Defendant CCSF is also liable for the violations of Plaintiffs' and Decedent's rights by their final policy makers, including Sheriff MIYAMOTO, Jail Captain TILTON, and CCSF's Department of Public Health Medical Director LOREN ROTH, M.D., as described above.  (See, Ninth Circuit Model Civil Jury Instruction 9.6).

95.     The unconstitutional actions and/or omissions of the individually named Defendants, DOES 1-20, other Sheriff's Office, Department of Public Health, and CCSF personnel, were approved, tolerated, and/or ratified by policy making officers for CCSF, including, but not limited to, Sheriff MIYAMOTO, Jail Captain TILTON, and JBHS Medical Director ROTH.  Plaintiffs are informed and believe, and thereupon allege, the details of this incident have been revealed to the authorized policy makers within CCSF and the San Francisco County Sheriff's Office, and that such policymakers have direct knowledge of the fact that MARKWHAN KITCHER-TUCKER was unlawfully denied necessary care for his serious medical needs, and denied timely restorative treatment due to their and their subordinates' misconduct and violations of Decedents' rights. Notwithstanding this knowledge, the authorized policymakers within CCSF and its Sheriff's Office have approved of the individually named Defendants' and DOES 1-20's conduct and decisions in this matter to the extent such individuals were under their supervision and oversight, and have made a deliberate, conscious and affirmative choice to endorse and ratify such conduct and decisions, and the basis for them, which resulted in the death of MARKWHAN KITCHER-TUCKER.  By so doing, the authorized policymakers within CCSF and its Sheriff's Office have shown affirmative agreement with the conduct of individual Defendants and other employees/agents under their supervision, and have ratified the unconstitutional acts of these individual Defendants, employees, and agents.

96.     The aforementioned choices, customs, policies, practices, and procedures; the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and, the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants CCSF, MIYAMOTO, TILTON, ROTH, and DOES 1-20 were a moving

force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in ¶ 83.

97.    As a direct and proximate result of the foregoing unconstitutional actions, omissions, customs, polices, practices, and/or procedures of Defendants CCSF, MIYAMOTO, TILTON, ROTH, and DOES 1-20, or the lack of adequacy thereof, Plaintiffs sustained serious and permanent injuries and damages and are entitled to damages, penalties, costs, and attorneys' fees, as set forth above, in ¶¶ 86-88 and punitive damages against Defendants MIYAMOTO, TILTON, ROTH, and DOES 1-20, in their individual capacities.

**THIRD CAUSE OF ACTION**
**(VIOLATION OF CIVIL CODE § 52.1)**
**PLAINTIFFS AGAINST DEFENDANTS CCSF, MIYAMOTO, TILTON, ROTH, ZHANG, and DOES 1-20**

98.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

99.    By their acts, omissions, customs, and policies, DEFENDANTS CCSF, MIYAMOTO, TILTON, ROTH, ZHANG, and DOES 1-20, each Defendant acting in concert/conspiracy, as described above, while MR. KITCHER-TUCKER was in custody, and by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Plaintiffs' and MR. KITCHER-TUCKER rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

      a.    Decedent's right to be free from an unreasonable ongoing seizure as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments to the United States Constitution and the California Constitution, Article 1, Sections 7 and 13;

      b.    Decedent's right to be free from deliberate indifference to MR. KITCHER-TUCKER's serious medical needs while in custody as a pretrial detainee, as secured by the Fourteenth Amendment to the United States Constitution and the California Constitution, Article 1, Section 7;

c.  Decedent's rights and liberty interests, as an incapacitated criminal defendant, to freedom from incarceration and to timely, restorative treatment, as secured by the Fourteenth Amendment to the United States Constitution and the California Constitution, Article 1, Section 7;

d.  Plaintiffs' right to be free from wrongful government interference with familial relationships and Plaintiffs' right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments;

e.  The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, Section 1;

f.  The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

100.  Defendants' violations of Plaintiffs' and Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[2]  Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of Plaintiffs' and Decedent's rights as described above, Defendants violated Decedent's rights by the following conduct constituting threat, intimidation, or coercion:

a.  Intentionally and with deliberate indifference, depriving and/or preventing MR. KITCHER-TUCKER from receiving necessary, life-saving medical and/or psychiatric care and treatment;

b.  Intentionally and with deliberate indifference, ordering and/or continuing MR. KITCHER-TUCKER's punitive housing in a segregated and/or disciplinary cell, under conditions of solitary confinement for long stretches of time, without necessary, life-saving medical and/or psychiatric care and treatment;

c.  Intentionally and with deliberate indifference, causing MR. KITCHER-TUCKER to languish in jail without necessary medical/psychiatric/pharmacological care, or even the required treatment

---

[2] See *Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); see also, *Cornell v. CCSF of San Francisco*, Nos. A141016, A142147, 2017 Cal. App. LEXIS 1011 at *58, f.n. 32 (Cal. Ct. App. Nov. 16, 2017) (approving *M.H., supra.*); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (following *Cornell*); *Rodriguez v. County of L.A.*, 891 F.3d 776, 799, 802 (9th Cir. 2018) (following *Cornell*).

plan, when he was obviously unable to care for his own needs, and after a court had determined he was unable to care for his own needs and was a serious threat to himself;

d.  Subjecting MR. KITCHER-TUCKER to ongoing violations of his rights to prompt care for his serious medical and psychiatric needs over days, causing immense and needless suffering, intimidation, coercion, and endangering his life and well-being;

e.  Requiring psychiatric patients at high risk of suicide to remain in jail without adequate supervision, competent mental health treatment, or any psychiatric treatment or treatment plan whatsoever, instead of allowing them to receive necessary medical and psychiatric care;

f.  Deliberately causing the provision of inadequate and incompetent mental health care to San Francisco County jail detainees and inmates;

g.  Choosing not to provide the required constant observation for inmates at high risk of suicide who are housed in segregated cells;

h.  Housing severely mentally ill inmates, who are receiving no psychiatric care and are at high risk of suicide, in segregated cells;

i.  Failing to transfer severely mentally ill and incompetent patients who are refusing to take prescribed and necessary psychiatric medication to a hospital or locked psychiatric facility where they can receive necessary care and medication;

j.  Instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as MR. KITCHER-TUCKER would be subjected to threat, intimidation, or coercion, and ongoing violations of rights;

k.  Intentionally and with deliberate indifference, doing and/or permitting subparagraphs (a) – (j) when it was also obvious that in doing so, Decedent's was at grave risk of suicide, and Plaintiffs' rights as Decedent's parents also would be violated.

101.    To the extent this claim is based on a violation of Decedent's rights, it is asserted as a survival claim.  To the extent that the violations of rights were done to Plaintiffs, it is asserted as a wrongful death claim.  To the extent the violations were done to both Decedent and Plaintiffs, it is asserted as both survival and wrongful death.

102.    The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

103.    Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

104.    Further, each Defendant violated Plaintiffs' and Decedent's rights with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights.

105.    Defendant CCSF is vicariously liable pursuant to California Government Code §815.2.

106.    As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiffs' and Decedent's rights under the United States and California Constitutions and law, Plaintiffs sustained injuries and damages, and against each and every Defendant named in this Complaint, are entitled to relief as set forth above at ¶¶ 86-88, including punitive damages against all individual Defendants, and all damages and other allowed by California Civil Code §§ 52 and 52.1 and California law, including but not limited to costs, attorneys' fees, treble damages and civil penalties.

**FOURTH CAUSE OF ACTION**
**(VIOLATION OF ADA (Title II) and REHABILITATION ACT)**
**(42 U.S.C. § 12132 &29 U.S.C. § 794)**
**PLAINTIFFS AGAINST DEFENDANT CCSF OF SAN FRANCISCO**

107.    Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

108.    Title II of the ADA prohibits discrimination on the basis of disability by public entities, which the Act broadly defines as "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(B). Similarly, §504 of the Rehabilitation Act of 1973 proscribes discrimination by "any program or activity[,]" 29 U.S.C. § 794(a), defined as "all of the operations of a department, agency, special purpose district,

or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b).  Defendant CCSF is a covered entity for purposes of enforcement of the ADA, 42 U.S.C. §12181(7)(F), and the Rehabilitation Act, 29 U.S.C. § 794, pursuant to the regulations promulgated under each of these laws.  Further, on information and belief, Defendant CCSF receives federal assistance and funds. Defendant CCSF is also within the mandate of the RA that no person with a disability may be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794.

109.    Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101 (a)(2).

110.    Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Discrimination under the ADA and RA includes not only, *e.g.*, a denial of benefits and services, but also a failure to provide a reasonable accommodation (also known as reasonable modification) for an individual's disability.

111.    Defendant CCSF is further mandated under the ADA not to utilize standards or criteria or methods of administration that have the effect of discriminating on the basis of disability. 42 U.S.C. § 12182(b)(1)(D)(i).  Discrimination includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities."  42 U.S.C. § 12182(b)(2)(A)(ii).

112.    At all material times, including, but not limited to prior to – and between – April 8, 2020 and January 10, 2021, MR. KITCHER-TUCKER was a "qualified individual" with a mental illness and disability and impairments that limited and/or substantially limited his ability to care for himself and control his mental, medical, or physical health condition as defined under the ADA, 42 U.S.C. § 12131 (2), and under Section 504 of the Rehabilitation Act ("RA") of 1973, 29 U.S.C. §

794, 28 C.F.R. 42.540 (k); as such, MR. KITCHER-TUCKER qualified as an individual with a disability under California law and MR. KITCHER-TUCKER met the essential eligibility requirements of CCSF programs to provide access to medical and mental health care services for its detainee/inmate patients in CCSF's jails while they are in custody.  Through its employees and agents, Defendant CCSF had knowledge of MR. KITCHER-TUCKER's obvious disability.

113.    As a "qualified [disabled] individual," Defendant CCSF was required to make reasonable accommodations for MR. KITCHER-TUCKER's disability and provide access to psychiatric care and other appropriate services while he was in custody as an inmate.  MR. KITCHER-TUCKER's status as a qualified disabled person also required Defendant CCSF not to engage in discrimination based on disparate treatment or impact to disabled persons like MR. KITCHER-TUCKER.

114.    Defendant CCSF discriminated against MR. KITCHER-TUCKER by failing to place him in a setting, and/or failing to provide appropriate services, to reasonably accommodate his disability and treatment needs.  Defendants' failure to reasonably accommodate MR. KITCHER-TUCKER's obvious disability in the course of his incarceration caused him to suffer greater injury and indignity in that process than other non-disabled inmates.

115.    Because of the aforementioned acts and omissions of the individual Defendants and others, working as employees and/or agents of Defendant CCSF, Defendant CCSF violated the ADA, RA, and discriminated against MR. KITCHER-TUCKER, violating his ADA, RA, and state protected rights by: (a) failing to provide services or accommodate MR. KITCHER-TUCKER as indicated and with appropriate classification, housing, and monitoring for a person in their sole and exclusive custody whom they knew was mentally disabled, at very high risk of suicide, and was found by the Superior Court to be mentally incompetent; (b) failing to provide reasonable accommodations to people in custody with mental disabilities at their hospitals, clinics, and jails and, instead, providing a quality of care and service that is different, separate, inferior, and worse than the service provided to other individuals with the same disabilities; (c) denying MR. KITCHER-TUCKER, a qualified individual with a disability, the opportunity to participate in or

benefit from the aid, benefit, or services of CCSF, including refusing MR. KITCHER-TUCKER's requests for reasonable accommodation such as supportive daily therapeutic interactions, in violation of 28 C.F.R. § 35.130(b)(1)(i); (d) by reason of Decedent's mental disabilities, Defendants did not afford Decedent an opportunity to participate in or benefit from the aid, benefits, and services that are equal to those afforded to other, non-disabled individuals by Defendants, in violation of 28 C.F.R. § 35.130(b)(1)(ii); (e) on the basis of Decedent's disability, the named Defendants failed to provide Decedent an aid, benefit, or service that was as effective in affording equal opportunity to obtain the same result, to gain the same benefit, and to reach the same level of achievement as provided to other individuals in the same situation, in violation of 28 C.F.R. §35.130(b)(1)(iii); (f) limited MR. KITCHER-TUCKER, a qualified individual with a disability, in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the aid, benefit, or service of which MR. KITCHER-TUCKER was denied, in violation of 28 C.F.R. §35.130(b)(1)(vii).

116.    Defendant CCSF, through its employees and agents, acted as described in this Complaint despite knowing, at all relevant times, that MR. KITCHER-TUCKER was a qualified individual under the ADA and RA with an obvious mental disability that greatly aggravated his risk of suicide.

117.    Further, all of Defendant CCSF's actions, choices, and decisions were policies or procedures, or a product thereof, instituted by Defendant CCSF that had a disparate impact on MR. KITCHER-TUCKER due to his disability, in violation of his rights under the ADA and RA.

118.    Thus, due to Defendant CCSF's failure to reasonably accommodate MR. KITCHER-TUCKER's disability, and Defendant CCSF's conduct and decisions that had a disparate impact on him and other similarly disabled individuals, causing MR. KITCHER-TUCKER to suffer greater injury and indignity than other non-disabled inmates, Defendant CCSF effectively treated non-disabled inmates more favorably than individuals with MR. KITCHER-TUCKER's disability and high risk of suicide.

119.    As a result of the acts and misconduct of Defendant CCSF complained of herein,

MR. KITCHER-TUCKER committed suicide, and Plaintiffs have suffered, are now suffering, and will continue to suffer damages and injuries as alleged above.  Plaintiffs sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set forth above, in ¶¶ 86-88.  Plaintiffs do not seek punitive damages against Defendant CCSF.

### FIFTH CAUSE OF ACTION
### (Negligence)
### PLAINTIFFS AGAINST CCSF, MIYAMOTO, TILTON, AND DOES 1-20

120.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

121.    At all times, Defendants CCSF, MIYAMOTO, TILTON and DOES 1-20, owed Plaintiffs and Decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

122.    At all times, these Defendants owed Plaintiffs and Decedent the duty to act with reasonable care.

123.    These general duties of reasonable care and due care owed to Plaintiffs and Decedent by these Defendants include but are not limited to the following specific obligations:

a.    To provide safe and appropriate jail custody for MARKWHAN KITCHER-TUCKER, including reasonable classification, monitoring, and housing, including placing him on suicide watch with proper suicide precautions, and preventing access to physical conditions and items that could foreseeably be used for suicide;

b.    To summon necessary and appropriate emergency and other medical care for MR. KITCHER-TUCKER;

c.    To use generally accepted law enforcement and jail procedures that are reasonable and appropriate for Plaintiffs' status as a mentally ill and/or emotionally disturbed person;

d.    To refrain from abusing their authority granted to them by law; and,

e.    To refrain from violating Plaintiffs' rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

124.     Defendants CCSF, MIYAMOTO, TILTON, and DOES 1-20, through their acts and omissions, breached each and every one of the aforementioned duties owed to Plaintiffs and Decedent.

125.     Defendant CCSF is vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code § 815.2.

126.     As a direct and proximate result of these Defendants' negligence, Plaintiffs and Decedent sustained injuries and damages, and against each and every Defendant named in this cause of action in their individual capacities are entitled to relief as set forth above at ¶¶ 86-88, including punitive damages against such individual Defendants.

### **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally:

1.     Compensatory and exemplary damages in an amount according to proof and which is fair, just, and reasonable;

2.     Punitive damages under 42 U.S.C. § 1983, federal law, and California law, in an amount according to proof and which is fair, just, and reasonable against all Defendants except the COUNTY;

3.     All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1; 42 U.S.C. § 12132 and 29 U.S.C. § 794, and as otherwise may be allowed by California and/or federal law;

4.     Declaratory and injunctive relief, including but not limited to the following:

    i.     An order requiring Defendants to institute and enforce appropriate and lawful training, supervision, policies, and procedures for handling mentally ill and/or emotionally disturbed persons, and/or persons with serious medical and mental health needs at CCSF's jails;

ii.   An order requiring Defendants to provide inmates at CCSF'S jail access to appropriate, competent, and necessary care for serious medical and psychiatric needs;

iii.  An order requiring Defendants to properly classify, house, and/or monitor inmates suffering from mental health disabilities, including placement on suicide watch with proper suicide precautions;

iv.   An order requiring Defendants to provide constant observation for all acutely suicidal inmates housed alone in segregated cells;

v.    An order requiring Defendants to create and follow treatment plans for all mentally ill inmates;

vi.   An order requiring Defendants to provide prescribed involuntary medication to inmates after the Court's or a *Riese* hearing findings of incompetence;

vii.  An order requiring Defendants to transfer severely mentally ill and IST inmates who are refusing prescribed medication to a hospital or locked psychiatric facility for needed care and medication;

5.    Such further relief, according to proof, that this Court deems appropriate and lawful.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial in this action.


Dated:  December 8, 2021                    HADDAD & SHERWIN LLP

                                            */s/ Julia Sherwin*
                                            _____
                                            JULIA SHERWIN
                                            Attorneys for Plaintiffs